IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:23-CR-539 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | |
| | ) | |
| JERRY BAKER, JR., | ) | SENTENCING MEMORANDUM |
| | ) | |
| Defendant. | ) | |

Now comes the United States of America, by and through its attorneys, Carol M. Skutnik, Acting United States Attorney, and Margaret A. Sweeney, Assistant United States Attorney, and hereby files this Sentencing Memorandum requesting that the Court impose a 168-month Guidelines sentence as calculated in the Final Presentence Report. (R. 220: Final PSR, PageID 1982-2020).

**I.      Factual and Procedural Background**

In 2021 and 2022, Jerry Baker operated a very profitable marijuana trafficking DTO that distributed pounds of marijuana in the Cleveland area that Baker purchased from Walter Sornoza in California. (R. 133: Plea Agreement, PageID 825). Baker and his co-conspirators used In & Out Tire Shop in Cleveland to store and distribute the marijuana. (*Id.* at PageID 825, 839). Baker also possessed four firearms at the Tire Shop during the course of the conspiracy. (*Id.* at Page 837). When Baker was not at the Tire Shop, he would direct others to distribute the marijuana for him to his customers. In one conversation, on October 27, 2022, Baker reprimanded one of his co-conspirators for giving a customer too much marijuana. (*Id.* at PageID 835, ¶¶ 50-51). During that conversation, Baker reminded his co-conspirator, "You suppose to call me and get verification!" (*Id.* at PageID 836, ¶51).

During the conspiracy, Baker spent hundreds of thousands of dollars on product from Sornoza.  (*Id.* at PageID 827, 828).  In addition to having his girlfriend transport some of the proceeds to Sornoza in California, Baker and Deshaun Martin directed others to convert the drug proceeds into money orders, which would then be transported to Sornoza in California.  (*Id.* at PageID 826, 827).

During the conspiracy, Baker also collected drug debts from his customers.  On November 11, 2022, "Baker made numerous threats toward" a person referred to as Victim D, who Baker believed had assisted another person, referred to as Victim B, escape from Baker as Baker attempted to collected a drug debt.  (R. 133: Plea Agreement, PageID 844).  After this happened, "Baker told Victim D that he would treat him like an 'opp' if Victim D did not repay Victim B's drug debt."  (*Id.*).  Intercepted calls from this day, outlined below and transcribed in Exhibit 1,[1] show that Baker used violence and threats of violence to collect the debt owed to him.

## II. Law and Argument

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Appellate courts must review a district court's sentence for procedural and substantive reasonableness.  *Id.* at 51.

---

[1] Government's Exhibit 1, which the government will seek to file under seal, are linesheests of transcriptions from intercepted calls on November 11, 2022. Excerpts of these linesheet are included herein, but the full linesheets should be filed under seal because they contain the identities of persons identified as victims in the indictment.  These linesheets were included in the discovery in this case, and on March 11, 2025, government counsel sent these linesheets to defense counsel as notice that these were the calls that the government would rely upon for the violence enhancement.  Defense counsel has indicted to government's counsel that he has no objection to the use of the linesheets in lieu of the calls at sentencing.

Although the Guidelines are advisory, appellate courts may apply a presumption of reasonableness to a sentence that falls within the Guideline range. *Id.*

    A.    <u>Advisory Guidelines Calculation</u>

As stated at the initial sentencing hearing, the government does not object to the final presentence report issued February 3, 2025. (R. 220: Baker Jr. PSR, PageID 1982-2020). Specifically, the United States agrees with the Guidelines enhancements outlined in the report. Further. the parties agree on the base offense level, the premises enhancement, and the money laundering enhancement. However, as stated at the initial sentencing hearing, Defendant objects to the leadership enhancement, the firearms enhancement, and the violence enhancement.[2] For the reasons outlined below, these enhancements are proper, and the calculation in the final presentence report is correct.

The United States also agrees with the criminal history score calculated in the report, which places Defendant into a Criminal History Category IV. (*Id.* at PageID 2007). Finally, the United States agrees with the advisory Guidelines range calculated in the report, and the United States asks that the Court impose a sentence of 168 months.

        *1.*    *Defendant Used Violence or Made a Credible Threat of Violence, and He Should Receive a Two-Level Enhancement*

In his objections to the PSR, Defendant argues that a two-level enhancement for violence should not apply because the threats related to the conspiracy to commit robbery, not the drug or money laundering conspiracy. Additionally, Baker argues that Baker's statements to Moniqka

---

[2] The leadership and firearms enhancements were addressed at the initial sentencing hearing. Nevertheless, for the purposes of the record, the United States outlines its support for these enhancements herein.

3

Hazzard, identified tin the presentence report, were "blowing off steam" and were not credible threats. Baker's own words during intercepted calls contradict such an argument.

Intercepted calls show that on November 11, 2022, Baker went to Aura Social Lounge, and when he was there, he saw a person referred to in the Indictment as Victim B, who owed Baker a $10,000 drug debt. (*See* Gov't Exhibit 1, Session 3504, 3525). Once Baker sees this person, he waits for him at the front door of the bar with a knife. As Baker described in an exchange with his girlfriend later on November 11, 2022:

| | |
|---|---|
| BAKER: | We go down to Aura and s--t, right? |
| M.H.: | Mmm. |
| BAKER: | [Victim B] in this bitch, right? |
| MH: | Mmm. |
| BAKER: | So *I got my knife* in this bitch, feel me.  So I'm about, you know, all types of s--t, going on.  So they cut the lights on, I'm waiting for him [Victim B] to come out the front door, right. |
| M.H.: | Mmm. |
| BAKER: | I'm just about to slice the n---a soon as he come out the door.  I'm about to take one buck, right across his face, right. |
| M.H.: | Mmm. |

(Gov't Exhibit 1, Session 3525) (emphasis added). As Baker is waiting for Victim B, another person, referred to in the indictment as Victim D, takes Victim B out of the back door of the bar. As Baker continued to tell his girlfriend:

| | |
|---|---|
| BAKER: | What does that n---a [Victim D] do? |
| M.H.: | What? |
| BAKER: | Let the n---a [Victim B] out the back door. |
| M.H. | You lyin'. |
| BAKER: | Man, I swear to God on everything I love.  He let this n---a out the back door.  I told that n---a [Victim B] you let that n---a out the back door.  You bitch ass n---a.  N---a you paying everything tomorrow n---a, or it's on n---a.  It's on, on, on, on, on.  You gonna pay my whole $10,000 tomorrow n---a or I'm a tell you, I'm going to treat you like an op or a bitch ass n---a. |

(*Id.*). At this point, it is clear from Baker's recitation of the story to his girlfriend that he made two threats of violence at Aura. The first threat of violence was to Victim B when Baker was

4

waiting for him with a knife outside the bar.  The threat was so credible that Victim D snuck Victim B out of the backdoor of the bar.  In fact, Baker recognized that his threat to Victim B was credible when Baker told his girlfriend:

> BAKER: Man, this n---a [Victim D] let this n---a [Victim B] out the back door!  I guess the n---a [Victim B] was scared to come out the front door.  You scared, n---a?  You did that.

(*Id.*).  The fact that even Baker recognized that Victim B was scared shows that the threat Baker posed was credible.  Indeed, that is why Victim D took Victim B out the back door, according to Baker.

This is what then lead to the second threat of violence, this time to Victim D, as retribution for helping Victim B.  During this second threat of violence, as Baker described it, Baker told Victim D, "You paying everything tomorrow . . . or it's on.  You gonna pay my whole $10,000 tomorrow . . . or I'm a tell you, I'm going to treat you like an op or a bitch ass n---a." What makes this threat credible is that it was done in the context of Baker having waited for Victim B with a knife outside of Aura, which Victim D had apparently seen and which caused him to sneak Victim B out the back door of Aura.

During the rest of the call with his girlfriend, Baker goes on to say several threatening things about what he will do to Victim D, including that he is going to "torture" him, "piss on his bar," and "smack his ass."  (*Id.*)  It is these threats that Baker challenges as not supporting the two-level enhancement.  (R. 247: Baker Supp. Sent'g Memo, PageID 2223).  Notably, Baker does not address the evidence of the direct threats he made to Victim B and Victim D earlier that day.  Although the generic threats Baker makes to M.H. are credible threats in light of the events at Aura Lounge, the direct threats that Baker made to Victim B and Victim D are sufficient to support the two-level violence enhancement.

5

The Sixth Circuit has held that this enhancement applies "if the defendant credibly communicated his intent to injure another without acting on that threat." *United States v. Dentmond*, Case No. 23-1558, 2024 U.S. App. LEXIS 12007, at *7 (6th Cir. May 15, 2024). Even though Baker did act on the threat to Victim B, he credibly communicated his intent, as evidenced by Victim D taking Victim B out the back door of Aura. The intercepted calls from Baker show that he believed his threat was credible and, therefore, the two-level enhancement should apply. *See Desmond*, 2024 U.S. App. At *7-8 ("[S]entencing courts may consider virtually anything as long as the information 'has sufficient indicia of reliability to support its probable accuracy.' . . . That reliability threshold is a 'relatively low hurdle' and demands nothing more than 'some evidentiary basis beyond mere allegation in an indictment.' (citing and quoting U.S.S.G. § 6A1.3(a), *United States v. Johnson*, 732 F.3d 577, 583 (6th Cir. 2013)).

Indeed, several other calls that Baker had on November 11, 2022, corroborate that he made these threats to Victim B and Victim D. At 2:28 a.m., Baker had a call with Deshaun Martin, who let Baker know that Victim B was "in the back," and Baker realized that it was Victim D who took Victim B out of the back of the bar:

| | |
|---|---|
| BAKER: | Where he at? |
| D.M.: | They say he's back there waiting on his ride. |
| BAKER: | Man I don't see that n---a. |
| D.M. | Unless they [Victim B's ride] came. |
| BAKER: | That n---a, that n---a, that n---a [Victim D], how you just take that n---a out the back, n---a? |

(*Id.* Session 3502). Baker then called another person with the initials L.H. at 2:32 a.m. after he hung up with Martin, and Baker told him what he said to Victim D for letting Victim B out of the back door:

| | |
|---|---|
| L.H.: | Yeah, that n---a was still in the back. |
| BAKER: | Man, that n---a, that n---a bruh, that n---a just walked that n---a out the back, man! That n---a knows what's going on, man! |

6

| | |
|---|---|
| L.H.: | He just called me talking about that. When I just— |
| BAKER: | Man, that n---a lying, man! That n---a just walked that n---a out the back, bruh! That n---a just walked that n---a out the back, man! That n---a is a bitch n---a! |
| L.H.: | What did he get in? [What car did Victim B get into] |
| BAKER: | Such a bitch n---a, that n---a is a bitch ass! I told that n---a [Victim D], n--a won't say nothing else to me, n---a! You is a bitch, n---a! Flat out, n---a. You gonna pay that n---a tab!? You gonna pay what that n---a owe!? N---a or you gonna shut the f---k up, bitch ass n---a. |

(*Id.*, Session 3504). Baker then had a call from Martin, who told Baker to come back to the bar, because someone who helped Victim D, who is unidentified but whom Martin describes as wearing a chain and a watch, is still in the bar and they are going to "get him." (*Id.*, Session 3506). Calls after this show that this person was robbed of the chain and the watch, and Baker and Martin joked about who is going to get the chain and the watch. (*Id.*, Session 3508). When Baker spoke to his father shortly after this happened, he described how this was in retaliation for the man in the chain and watch helping Victim B get out of the bar away from Baker:

| | |
|---|---|
| BAKER: | They got it. |
| J.B. Sr.: | They got him? |
| BAKER: | Yeah, yup. |
| J.B. Sr.: | Hey, they got his ass quick! |
| BAKER: | Yeah they did. [Laughing]. Violent too. |
| J.B. Sr.: | It's like he knew what was going down. It's like he knew it, didn't he? |
| BAKER: | You want to get involved in grown man business . . . walking out the back door . . . there you go, cat daddy. |

(*Id.*, Session 3510).

These calls show that Baker made two threats of violence on November 11, 2022, in pursuit of his drug debt from Victim B. The first when he was lying in wait outside Aura waiting for Victim B, causing Victim D to help Victim B avoid Baker by taking him out the back door, and the second when Baker threatened Victim D in retaliation and making him responsible for Victim B's drug debt. Therefore, the two-level enhancement pursuant to § 2D1.1(b)(2) should apply.

7

> 2. *Defendant was a Manager, or Supervisor of Others*

The presentence report properly includes a three-level increase pursuant to §3B1.1(b) because Defendant was a manager, or supervisor of the drug trafficking crime for which he was convicted. The Guidelines direct that in determining whether the enhancement applies, "the court should consider . . . the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." § 3B1.1 n. 4.

Here, the facts that Baker admitted to in his plea agreement show that he exercised decision making authority over others. Specifically, Baker admitted that he "controlled the day-to-day operations of the Baker Enterprise, including who was able to traffic narcotics on behalf of the Enterprise and collect and launder the proceeds of the Enterprise." (R. 133: Plea Agreement, PageID 839, ¶ 68(B)). Baker also directed other members of the conspiracy to distribute marijuana from the Tire Shop on behalf of the organization. (*See id.*, PageID 32). Indeed, on October 27, 2022, Baker reprimanded another co-conspirator for giving a customer too much marijuana. (R. 133: Plea Agreement, PageID 835, ¶ 50, 51). Additionally, Baker and Martin directed at least one co-conspirator to convert cash drug proceeds into money orders, which Baker then transferred to Sornoza. Additionally, the record shows that Baker claimed A right to a larger share of the profits than an average participant. Specifically, he used $114,000 of drug proceeds to purchase the Tire Shop on June 3, 2022. (*Id.* at PageID 828).

Moreover, the three-level enhancement for Baker's leadership role is appropriate because there were five or more participants in the organization. Indeed, pursuant to § 3B1.1(b), if the

8

defendant was a manager or supervisor, but not leader or organizer, and the criminal activity involved five or more participants, a three-level rather than a two-level increase should apply. Here the record shows that Baker's organization involved five or more people.  Undisputedly, Baker's organization involved himself, Sornoza and Garcia who shipped the drugs to Cleveland, two couriers, who transported the drugs to Baker, Dehaun Martin, at least two co-conspirators who distribute drugs at the Tire Shop at Baker's direction, and Baker's girlfriend, who transported the drug proceeds to California on Baker's behalf.  Therefore, the three-level enhancement is appropriate.

        3.    *Baker Possessed Multiple Firearms in Connection with His Drug Trafficking*

The presentence report properly assesses a two-level enhancement for possession of a firearm.  Pursuant to § 2D1.1(b)(1), "[i]f a dangers weapon (including a firearm) was possessed," a two-level enhancement applies to the offense level.  Baker objects to this enhancement, arguing that there is no evidence that Baker knew the guns were at his house or his Tire Shop. (R. 220: Presentence Report, PageID 2019).  Baker, however, pled guilty to possessing these firearms in Counts 11 and 12.  Additionally, in his plea agreement, Baker admitted to possessing firearms at the Tire Shop, which was the hub for his marijuana distribution. (R. 133: Plea Agreement, PageID 837).  Baker used this location as a place where customers would meet him or others he directed to pick up marijuana, and it is where Baker stored his marijuana prior to distributing it. Therefore, the two-level enhancement should apply.

### III. CONCLUSION

For the foregoing reasons, the government requests that this Court impose a 168 month sentence, within the advisory Guidelines range, as outlined in this memorandum.

> Respectfully submitted,
>
> CAROL M. SKUTNIK
> Acting United States Attorney
>
> By:  /s/ Margaret A. Sweeney
> Margaret A. Sweeney (OH: 0086591)
> Assistant United States Attorney
> United States Court House
> 801 West Superior Avenue, Suite 400
> Cleveland, OH 44113
> (216) 622-3990
> (216) 522-7499 (facsimile)
> Margaret.Sweeney@usdoj.gov